## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SHARA LYNN BAILEY,<br><br>    Plaintiff,<br><br>    v.<br><br>EXPERIAN INFORMATION<br>SOLUTIONS, INC.,<br><br>    Defendant. | Case No. 1:21-cv-00465-BLW<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

## INTRODUCTION

This case is brought by an individual, Plaintiff Shara Lynn Bailey, against a Credit Reporting Agency (CRA), Experian Information Solutions, Inc.. Bailey claims that Experian violated the Fair Credit Reporting Act (FCRA) by inaccurately reporting debts on her credit report that were previously discharged in her Chapter 7 bankruptcy.

Experian now asks the Court to exclude portions of the testimony sought to be offered by Bailey's experts, and to grant it summary judgment on each of Bailey's claims. Dkts. 50 & 51. The Court held oral argument on these motions on July 12, 2023. Dkt. 71. For the reasons explained below, the Court will partially grant and partially deny both motions.

**MEMORANDUM DECISION AND ORDER - 1**

## BACKGROUND

### 1.    Bailey's Chapter 7 Bankruptcy

Shara Lynn Bailey filed for Chapter 7 bankruptcy in March of 2020 and received an Order of Discharge (Dkt. 50-5) the following month. *Compl.* ¶¶ 50–51, Dkt. 1. The order provided a "general summary" of the discharge but did not specifically identify the discharged debts. *Id.* Noting that bankruptcy law "is complicated," the discharge order directed its readers to "consult an attorney to determine the exact effect of the discharge in this case." *Def.'s Statement of Undisputed Facts* at 6, Dkt. 50-2.

Bailey listed numerous debts on her bankruptcy petition, including a secured auto loan from Alpine Credit Union (the "Alpine account") that she used to purchase a car in 2017, and a $205.00 balance on an unsecured line of credit with Zions First National Bank (the "Zions account"). *Id.* at 6, 8. Both debts were discharged in the bankruptcy.

### 2.    Experian's Procedures for Post-Bankruptcy Credit Reporting

Most, but not all, consumer debts are discharged in Chapter 7 bankruptcies. *See, e.g.*, 11 U.S.C. § 523 (listing exceptions to discharge). And ordinarily, as here, bankruptcy discharge orders do not specifically identify which debts are discharged. Accordingly, to determine which of a consumer's debts were discharged in a bankruptcy, credit reporting agencies like Experian rely on three

**MEMORANDUM DECISION AND ORDER - 2**

sources of information: (1) Experian's public records furnisher, LexisNexis Risk

Data Management Inc.; (2) data furnishers who provide account information

directly to Experian; and (3) consumers themselves. *Def.'s Statement of*

*Undisputed Facts* at 1, Dkt. 50-2.

Sometimes, however, Experian does not receive information from any of

those three sources regarding the status of a consumer's debt following a Chapter 7

bankruptcy. In such cases, Experian relies on certain default assumptions about the

kinds of debts that are more or less likely to be discharged in bankruptcy. That set

of assumptions was at the heart of a 2008 federal class-action lawsuit against

Experian in the United States District Court for the Central District of California:

*White v. Experian Info. Sols., Inc.*, No. 05CV1070, 2008 WL 11518799 (C.D. Cal.

Aug. 19, 2008).

In *White*, a class of individuals sued Experian under the FCRA for

inaccurately continuing to report debts that had been discharged in bankruptcy. *Id.*

at *1. Specifically, the plaintiffs claimed that by merely relying on data furnishers

and public record vendors to report the discharged status of debts and judgments,

Experian failed to maintain "reasonable procedures" assuring the maximum

possible accuracy in its post-bankruptcy credit reporting. *Id.*

Ultimately, the parties negotiated—and the Court approved—an injunction

**MEMORANDUM DECISION AND ORDER - 3**

(the "*White* injunction") detailing a new set of procedures intended to reduce the likelihood of inaccuracies in post-bankruptcy reporting. Specifically, the injunction set forth certain assumptions that Experian was required make about pre-bankruptcy debts "based on the statistical likelihood of discharge of [those] categories of debt." *Id.* at *13, ¶ 5.1. The court found that the procedures outlined in the injunction were reasonable, and therefore "conclusively deemed to comply with the FCRA." *Id.* at *14, ¶ 5.4.

One assumption imposed by the *White* injunction is that open, derogatory accounts—such as those in collections, charged off, or more than 120 days past due—are assumed to have been discharged in bankruptcy. *Def.'s Statement of Undisputed Facts* at 4, Dkt. 50-2 (citing *White*, 2008 WL 11518799, at *10 ¶ 3.2(b)(i), (iii), (c)(i), *11 ¶ 3.2(c)(iii), (d)(i), (iii)). And, on the flip side, accounts reporting a "current status" when a consumer files for bankruptcy are not assumed to have been discharged. *Id.* (citing *White*, 2008 WL 11518799, at *5 ¶ 2.10, *10 ¶ 3.2(b)(ii)(E), *11 ¶ 3.2(c)(ii)(E)).

In the wake of the *White* injunction, Experian developed an automated "bankruptcy scrub" procedure designed to identify debts presumably discharged under the assumptions set forth in *White*. *Def.'s Statement of Undisputed Facts* at 1, Dkt. 50-2. Under the procedure, an initial scrub runs within eight days after

Experian is notified of a consumer's Chapter 7 bankruptcy. *Id.* at 4–5. Following the initial scrub, Experian continues to monitor the consumer's debts by running follow-up scrubs every month for eighteen months after the bankruptcy. *Id.*[1] The purpose of those subsequent scrubs is to identify debts that were current at the time of discharge but have subsequently moved into a category that, under *White*, indicates the debt was discharge in bankruptcy. *Hamilton Dec.* at ¶ 15, Dkt. 50-3.

### 3. Experian's Reporting of Bailey's Discharged Debts

It is undisputed that Experian failed to accurately report two of Bailey's debts as discharged, with zero-dollar balances, following her Chapter 7 bankruptcy.

#### A. Alpine Account

At the time of Bailey's bankruptcy in June 2020, she was current on her auto loan payments to Alpine. *Def.'s Statement of Undisputed Facts* at 6, Dkt. 50-2. Following her bankruptcy, Bailey continued making payments on the account in order to retain possession of the vehicle. *Id.* Accordingly, Alpine continued reporting the account as "current" in the months immediately following the bankruptcy. *Hamilton Decl.* ¶ 19, Dkt. 50-3. In February and March of 2021,

---

[1] Until January 2021, Experian ran its post-discharge scrub once every other month. *Hamilton Decl.* ¶ 14, Dkt. 50-3.

Alpine reported the account as thirty and sixty days late, respectively, but then in April and May of 2021, Alpine again reported the account as current. *Id.* Experian continued reporting the Alpine account balance on Bailey's credit report, and Bailey never informed Experian that the account had been discharged in her bankruptcy. *Atkinson Decl.* ¶ 10, Dkt. 50-14; *Atkinson Dep.* at 17: 25–18:19, 26:19–27:8, Dkt. 55-21.

Eventually, Bailey stopped making payments on the Alpine account and, in June 2021, Alpine reported the account as "charged off." *Hamilton Decl.* ¶ 22, Dkt. 50-3. Within a week, Experian's post-bankruptcy scrub identified the account as discharged and began accurately reporting a zero-dollar balance. *Id.*

## B.    Zions Account

At the time of Bailey's bankruptcy, she was also current on her Zions account payments. *Hamilton Decl.* ¶ 20, Dkt. 50-3; *Fregia Decl.* ¶¶ 4–7, Dkt. 50-15. Following her bankruptcy, neither Zions nor Bailey informed Experian that the account had been discharged. Moreover, unlike Alpine, Zions altogether ceased updating Experian on the account's status. *Fregia Decl.* ¶¶ 8–9, Dkt. 50-15.

When Experian ran its initial post-bankruptcy scrub in July of 2020, the most recent account update was nearly five months old. In other words, the account was "stale"—a label Experian uses to describe accounts that have not been updated

in more than ninety days. *Pl.'s Memo. in Opp.* at 10, Dkt. 55. Nevertheless, because the account was reported as "current" at the time of the bankruptcy, Experian continued reporting the account balance on Bailey's credit reports. Eventually, when Bailey filed this lawsuit alleging that the Zions account was discharged in her bankruptcy, Experian began accurately reporting the account as discharged with a zero-dollar balance. *Hamilton Decl.* ¶ 23, Dkt. 50-3.

### C.    Effect of Inaccuracies

Bailey claims that Experian's inaccurate reporting of her Alpine and Zions accounts harmed her ability to obtain credit in two ways: by increasing her debt-to-income ratio, and by reducing her credit score.

A consumer's debt-to-income ratio (DTI) reveals how much of their current income goes toward paying their debt obligations. Dkt. 55-9. It is calculated simply by adding up a consumer's monthly debt payments and dividing the sum by the person's gross monthly income. *Id.* Thus, the higher a consumer's DTI, the less appealing she is to lenders and the less likely she is to obtain a loan at a low interest rate. Experian included the Alpine and Zions account balances when calculating Bailey's DTI. Dkt. 50-10. Doing so increased her reported debt by approximately tenfold and increased her reported monthly debt payments by $453. *Pl.'s Statement of Disputed Fact*s at 9, Dkt. 55-1.

Credit scores are based on a variety of financial factors and are designed to reflect a consumer's creditworthiness. The higher a person's credit score, the less risky she will appear to lenders, and the more likely she will be to obtain a loan with a low interest rate. Bailey claims that Experian provided an unduly low credit score to her potential lenders because it erroneously included her discharged Alpine and Zions accounts in her credit score calculation. Consequently, she explains, it was more difficult for her to obtain loans on favorable terms.

**4.     Bailey's Credit Applications**

Bailey submitted numerous credit applications between the time of her bankruptcy in June 2020 and filing this lawsuit in December 2021. At least two of those applications were treated unfavorably by lenders who had received Experian's inaccurate credit reports.

First, in February 2021, Citibank denied Bailey's application for a $3,000 line of credit after receiving Experian's inaccurate credit report. Dkt. 50-23. Second, that same month, Santander approved Bailey for an auto loan on less favorable terms than CapEd Credit Union, which—unlike Santander—relied not on Experian's inaccurate credit report but on TransUnion's accurate report. *Pl.'s*

*Statement of Disputed Facts* at 9–10, Dkt. 55-1.[2]

**5.      This Lawsuit**

Bailey filed this lawsuit against Experian in December 2021, claiming that Experian violated the FCRA by failing to implement procedures that would reasonably assure "maximum possible accuracy" in its credit reporting. *Compl.*, Dkt 1. Bailey claims to have suffered financial harm in the form of Citibank's credit denial and Santander's unfavorable loan terms, as well as serious emotional distress due to Experian's inaccurate reporting.

After discovery closed, Experian filed two motions, one seeking to exclude portions of the testimony offered by Bailey's experts, and one requesting summary judgment on each of Bailey's claims. The Court will take up both motions, in turn.

## MOTION TO EXCLUDE EXPERT TESTIMONY

Federal Rule of Evidence 702 limits the admissibility of expert testimony in two ways. First, it only permits those with special "knowledge, skill, experience, training, or education," to testify as experts. FED. R. EV. 702. And second, it limits qualified experts to offering testimony that "will help the trier of fact to understand

---

[2] Santander approved Bailey for a $38,049 loan at 14.27% for a 72-month term. Tarter Report at 15, Dkt. 54-3. CapEd approved Bailey for a $37,908 loan at 9.85% interest rate for an 84-month term. *Id.*

the evidence or to determine a fact in issue," is based on "sufficient facts or data,"

is "the product of reliable principles and methods," and is "reliably applied" to the

facts of the case. *Id.*

The Ninth Circuit has summarized the requirements of Rule 702 as follows:

"expert testimony must (1) address an issue beyond the common knowledge of the

average layman, (2) be presented by a witness having sufficient expertise, and (3)

assert a reasonable opinion given the state of the pertinent art or scientific

knowledge." *United States v. Vallejo*, 237 F.3d 1008, 1019 (9th Cir. 2001) (citing

*United States v. Morales*, 108 F.3d 1031, 1038 (9th Cir. 1997)). District courts

have broad discretion in applying this test. *Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 142 (1999).

Experian asks the Court to exclude several portions of the testimony that

Bailey's experts seek to offer. One of Experian's objections is specific to testimony

from Evan Hendricks, while the others apply to testimony from both Hendricks

and Thomas Tarter.

## 1.    Objection Specific to Hendricks

Experian first objects to Hendricks' testimony about prior cases,

administrative actions, and consent decrees. *Def.'s Memo. in Supp.* at 17, Dkt. 51-

1. Experian argues that such testimony is not relevant to this case and is not the

kind that would require "specialized knowledge, skill, or experience." *Id.* Bailey responds that Hendricks' analysis of prior legal actions involving Experian's credit reporting procedures is relevant and admissible under Federal Rule of Evidence 404(b)(2), to show that Experian had notice of the inaccuracies caused by its post-bankruptcy reporting procedures. Experian has the better argument.

Even if the existence of prior legal actions involving Experian would be admissible under Rule 404(b)(2), "expert testimony is unnecessary" because no specialized knowledge or expertise is needed to understand the existence of those prior actions and to draw reasonable inferences from them. *See Anderson v. Equifax Info. Servs., LLC*, Case No. 2:16-CV-2038-JAR, 2018 WL 1542322, at *7 (D. Kan. Mar. 29, 2018) (excluding Hendricks' testimony about prior cases, consent decrees, and administrative actions). That is, Hendricks' expert testimony about those prior legal actions "would not be particularly helpful to the trier of fact." *Id.*; *see also Malverty v. Equifax Info. Servs., LLC*, Case No: 8:17-CV-1617-T-27AEP, 2019 WL 5549146, at *3 (M.D. Fla. Oct. 28, 2019) (similar); *Valenzuela v. Equifax Info. Servs., LLC*, No. CV-13-02259-PHX-DLR, 2015 WL 6811585, at *3 (D. Ariz. Nov. 6, 2015) (similar); *Brown v. Vivint Solar, Inc.*, 612 F.Supp.3d 1337, at 1345 (M.D. Fla. 2020) (similar).

Hendricks may not testify about, or attempt to interpret, prior cases,

administrative actions, or consent decrees.

**2.      Objections Applicable to Both Experts**

Experian also raises numerous objections applicable to both experts.

**A.      Experian's Post-Bankruptcy Scrub Procedures**

First, Experian argues that neither expert has sufficient expertise to testify about its procedures for reporting consumer debts following Chapter 7 bankruptcies. In response, Bailey argues that Hendricks has extensive knowledge and experience with issues surrounding the FCRA, and indeed, has been permitted to testify about credit reporting procedures in a multitude of FCRA lawsuits in other districts. *See, e.g.*, *Ma v. Equifax Info. Servs., LLC*, 288 F. Supp. 3d 1360, 1366 (N.D. Ga. Dec. 13, 2017); *Valenzuela*, 2015 WL 6811585, at *3.

The Court agrees that Hendricks has extensive expertise in the field of consumer credit reporting and the FCRA, *see* Hendricks Report at 25–47, Dkt. 55-3, and is qualified to testify about the industry standards for reporting debts that have been discharged in bankruptcy. However, the Court is not persuaded that he has sufficient expertise in the field of bankruptcy to opine on the reasonableness of Experian's post-bankruptcy scrub procedures.

When pressed during his deposition, Hendricks admitted that he does not know if every debt is discharged in bankruptcy, and that there "might be

exceptions" where certain debts are not discharged. *Hendricks Dep.* at 66:17–22, Dkt. 51-3. Experian's post-bankruptcy scrub procedure—the one Bailey claims is unreasonable—is based on assumptions about the statistical likelihood of particular categories of debts being discharged in Chapter 7 bankruptcies. The reasonableness of the procedures therefore depends, at least in part, on the dictates of bankruptcy law over debts existing at the time of bankruptcy. Hendricks lacks the necessary expertise on that question to offer an opinion as to the reasonableness of Experian's procedure.

The same is true of Tarter. Like Hendricks, Tarter lacks knowledge and expertise surrounding the kinds of debts discharged—and exempted from discharge—in Chapter 7 bankruptcies to opine on the reasonableness of Experian's post-bankruptcy scrub procedure. As Tarter admitted during his deposition, the statutory exceptions to discharge are "outside the scope of [his] expertise," and his opinion as to the reasonableness of Experian's procedures appears based upon the mere fact of inaccuracy rather than any specialized knowledge about the debts ordinarily discharged in bankruptcy. *Tarter Dep.* at 97:3–17, Dkt. 51-6.

Moreover, as Experian points out, Tarter's testimony that Experian failed to comply with industry standards set by Equifax and Trans Union lacks the necessary indications of reliability. During his deposition, Tarter acknowledged

that he did not actually know what systems, controls, policies, and procedures Equifax and Trans Union had in place that Experian lacked. *Id.* at 177:20–178:12. That being so, his opinion that Experian's procedures fell short of the industry standard appears to be merely an inference based upon the fact that Equifax and Trans Union accurately reported the Alpine account as discharged but Experian did not. *Id.* at 178:20–179:12. That inference is for the jury to adopt or discard. Tarter's opinion on this issue, which appears based "on personal belief rather than expert analysis," will therefore be excluded. *Aspro, Inc. v. Comm'r of Internal Revenue*, 32 F.4th 673, 676 (8th Cir. 2022).

## B.   Emotional Distress

Experian next argues that neither expert is qualified to testify about Bailey's alleged emotion distress. *Def.'s Memo. in Supp.* at 10, Dkt. 51-1. Bailey agrees, explaining that neither expert will offer any "opinions quantifying Plaintiff's damages, or the existence of physical or emotional injuries." *Pl.'s Resp.* at 5, Dkt. 54. As Experian notes, however, Tarter's report does contain references to Bailey's alleged emotion distress. *See* Tarter Report at 18 ("Ms. Bailey was harmed and damaged economically and emotionally."), 27–28 ("It is my opinion that Ms. Bailey was damaged by EXP in multiple ways including . . . Loss of Quality of Life . . . Loss of sleep . . . Stress, anger, humiliation and anxiety[.]").

Neither expert is qualified to testify about the existence or extent of any alleged emotional distress.

### C.     Common Harms

Experian asks the Court to exclude Hendricks' and Tarter's testimony about harms that are commonly experienced by consumers because of inaccurate credit reporting. *Def.'s Memo. in Supp.* at 11, Dkt. 51-1. Bailey responds that such testimony is important to assist the jury in balancing the "tradeoff between implementing better policies and procedures, and the impact/risk to consumers for Experian's failure to do so." *Pl.'s Resp.* at 14, Dkt. 54. Again, Experian has it right.

This is not a case where the jury must determine what kinds of harms *could* flow from the defendant's conduct. In an attempt to analogize, Bailey cites a case in which the FTC sued a company for violating Section 5(a) of the Federal Trade Commission Act. *F.T.C. v. Accusearch, Inc.*, Civil No. 06–CV–105–D, 2010 WL 4502991 (D. Wyo. June 21, 2010). There, the court permitted Hendricks to testify about the harms "caused or *likely to be caused*" by the defendant's business practices. *Id.* (emphasis added). Bailey argues that the Court should do the same here by allowing Hendricks and Tarter to testify about harms that commonly result from inaccurate credit reporting.

There is, however, an important difference between the FTC Act provision

at issue in the *Accusearch* case and the FCRA provision at issue here. The FTC Act imposes liability on a defendant whose practice "causes *or is likely to cause* substantial injury to consumers." (emphasis added). In that statutory context, Hendricks' testimony assisted the jury in determining what kinds of injuries were "likely" to flow from the defendant's practices.

In contrast, the FCRA only authorizes lawsuits by individuals who, themselves, suffer actual harm. Accordingly, in this case, unlike in the *Accusearch* case, Hendricks' and Tarter's testimony about harms that *could* flow from inaccurate credit reporting "would not assist the jury," because the jury must only determine what harms, if any, Bailey actually suffered. *Malverty,* 2019 WL 5549146, at *2.

Neither expert may testify about harms that are commonly experienced by consumers because of inaccurate credit reporting.

**D.    Impact on Bailey's Credit Score**

Experian also seeks to bar Hendricks and Tarter from opining on the effect Experian's inaccurate reporting may have had on Bailey's credit score. Experian challenges the reliability of the experts' testimony, noting that neither expert conducted a technical "credit scoring analysis or credit modeling" to determine the precise impact of Experian's reporting on Bailey's score. *Def.'s Memo. in Supp.* at

12, Dkt. 51-1. Instead, both relied upon the "'general parameters' of the FICO scoring system" to "speculate that Experian's reporting of the Alpine and Zions accounts harmed Plaintiff's credit score." *Id.*

Hendricks has sufficient expertise in credit reporting to testify about the mechanics of credit reporting, credit scoring, and debt-to-income ratios. He is therefore also qualified to testify that Experian's inaccurate reporting of the Alpine and Zions accounts likely affected Bailey's credit score and debt-to-income ratio. *See, e.g.*, *Hendricks Dep.* at 216:18–21, Dkt. 51-3 ("[I]t certainly was a substantial factor in the denigration of her credit scoring in the Experian report."); Hendricks Report at 11–12, Dkt. 55-3. However, as Experian notes, Hendricks has not performed the kind of technical review necessary to opine on precisely how many points Bailey's credit score was reduced because of the inaccurate reporting.[3]

Neither expert may testify that Experian's inaccurate reporting caused a 100-point decrease in Bailey's credit score. *See* Tarter Report at 30, Dkt. 54-3 ("[Experian]'s inaccurate negative reporting on the Alpine and Zion Accounts . . . resulted in a 100-point difference in her credit scores[.]"). As Experian explains,

---

[3] The Court has not identified any instance in Hendricks' report or deposition where he suggests that Experian's inaccurate reporting resulted in a specific point or percentage reduction to Bailey's credit score. Nevertheless, the Court takes this opportunity to make clear that he may not do so.

that testimony is not the product of a reliable application of principles and methods because it ignores the fact that TransUnion and Experian used different credit scoring models to calculate those scores. *Def.'s Memo. in Supp.* at 13, Dkt. 51-1. And, indeed, as Hendricks himself recently testified in another federal case, credit scores can vary widely depending on which particular credit scoring model is used. *See Def.'s Notice of Supp. Ex.* at 152:7–153:3, Dkt. 69. A straight-across comparison of Experian's and TransUnion's credit scores fails to reliably account for the different credit scoring models—as well as the hour-by-hour variation common in credit scoring—and is therefore not admissible under Rule 702.

### E.    Causation

Experian seeks to preclude Bailey's experts from testifying that Experian's inaccurate reporting was the cause of Citibank's and Santander's adverse lending decisions. The Court will grant Experian's request, in part, as to both experts.

Hendricks lacks sufficient expertise in the fields of underwriting and consumer lending to opine on how Citibank's and Santander's lending decisions may have been affected by Experian's inaccurate reporting. His testimony will therefore be excluded. Tarter, on the other hand, has substantial expertise in consumer lending. Yet, as Experian argues, his testimony as to causation is unreliable because he failed to consider alternative explanations for Citibank's and

Santander's credit decisions. Bailey did not address this argument in her response, nor does Tarter's report itself refute Experian's concern.

Tarter seeks to testify that Experian's inaccurate reporting of Bailey's Alpine and Zions accounts was the cause of Citibank's and Santander's adverse credit decisions. Tarter Report at 30, Dkt 54-3. But Tarter fails to account for the other prominent factors—including Bailey's recent bankruptcy and over fifteen other derogatory accounts—that may have independently produced the same result. Tarter's failure to "adequately account[] for alternative explanations" casts doubt on the reliability of his testimony that Experian's inaccurate reporting was *the* cause of the lenders' adverse decisions. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014) (citing Fed. R. Evid. 702, Committee Notes on Rules—2000 Amendment); *see also Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502–03 (9th Cir. 1994).

Accordingly, Tarter may not testify that Experian's inaccurate reporting was the sole cause of Citibank's and Santander's adverse credit decisions, but he may testify that the inaccurate reporting was one factor that likely contributed to those decisions.

### F.     Experian's State of Mind

Experian seeks to bar Hendricks and Tarter from testifying about Experian's

knowledge, motivations, intentions, state of mind, and subjective beliefs. Bailey agrees with Experian's position, in principle, but contends that her experts' testimony relates to the industry standards, not Experian's subjective state of mind.

To the extent that Hendricks' and Tarter's testimony is about the industry standard for reporting discharged debts, it will not be excluded under Rule 702 simply because it could also reflect Experian's subjective awareness of that standard. That said, however, upon review of the expert reports and depositions, the Court agrees with Experian that portions of the experts' opinions do include speculation as to Experian's state of mind. *See, e.g.*, Tarter Report at 24 & 27, Dkt. 54-3; Hendricks Report at 2 & 15, Dkt. 55-3; Hendricks Rebuttal Report at 3, Dkt. 51-5; *Hendricks Dep.* at 86:6–19, 166:11–18, Dkt. 51-3; *Tarter Dep.* at 190:24–191:5, Dkt. 51-6. Those statements "are not the subject of proper expert opinion testimony" and will be excluded. *Anderson*, 2018 WL 1542322, at *5.

## G.    Legal Opinions & Legal Conclusions

Finally, Experian objects that portions of the expert reports and depositions include improper legal opinions and conclusions. As the Ninth Circuit has made clear, "[a]n expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058–59 (9th Cir. 2008). Experian cites numerous examples

throughout the expert reports where Tarter and Hendricks offer their own legal

opinions and conclusions. *See Def.'s Mem. in Supp.* at 19 n.10, Dkt. 51-1

(collecting examples). Those opinions will be excluded.

## MOTION FOR SUMMARY JUDGMENT[4]

### 1.     Legal Standard—Summary Judgment

To obtain summary judgment, a party must show that "there is no genuine

issue as to any material fact and [that she] is entitled to judgment as a matter of

law." FED. R. CIV. P. 56(a); *see Dzung Chu v. Oracle Corp.*, 627 F.3d 376, 387

(9th Cir. 2010). If the movant makes that showing, the burden shifts to the

opposing party to identify "specific facts demonstrating the existence of genuine

issues for trial." *Id.* A mere "scintilla of evidence" will not do, however; "there

must be evidence on which the jury could reasonably find for the [non-movant]."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In determining whether summary judgment is appropriate, courts view the

evidence in the light most favorable to the non-movant, giving them the benefit of

all reasonable inferences. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 440 (9th Cir.

---

[4] In deciding Experian's Motion for Summary Judgment (Dkt. 50), the Court will not consider any portions of the expert testimony that it deemed inadmissible elsewhere in this Order. *See Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988) ("It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.").

2017).

## 2.    Legal Standard—Fair Credit Reporting Act (FCRA)

Under the Fair Credit Reporting Act (FCRA), Credit Reporting Agencies (CRAs) like Experian must "follow reasonable procedures to assure maximum possible accuracy of the information" when preparing consumer credit reports. 15 U.S.C. § 1681e(b). The FCRA is not a strict liability statute, however, and a consumer may only sue a CRA if she has suffered actual harm as a result of a negligent or willful violation of the FCRA. § 1681(n) & (o); *see also Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1109 (8th Cir. 2022) ("The FCRA requires reasonable—not perfect—procedures.").

## 3.    Experian is entitled to summary judgment on Bailey's willfulness claim as to the Alpine account, but not the Zions account.

The FCRA authorizes aggrieved consumers to sue CRAs who "willfully fail[] to comply" with the statute's provisions. 15 U.S.C. § 1681n(a). A violation is "willful" if the CRA knew or was reckless as to whether its conduct was unlawful under the FCRA. *Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47, 57 (2007). A CRA acts recklessly, in turn, if its interpretation of the FCRA creates "a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* Conversely, so long as a CRA adopts a "reasonable reading of the statute's terms," it does not act recklessly under § 1681n. *Id.* at 69.

**MEMORANDUM DECISION AND ORDER - 22**

Bailey claims that Experian willfully violated the FCRA by continuing to report discharged debts on her credit report following her Chapter 7 bankruptcy. Experian responds, in part, by arguing that it could not possibly have acted recklessly because its post-bankruptcy reporting procedures complied with—and were directly derived from—the procedures that a federal court required it to adopt in the *White* injunction.

These arguments highlight one of the key questions before the court: what is the legal significance of Experian's compliance with the *White* injunction? According to Experian, compliance with the *White* injunction wholly immunizes it from Bailey's lawsuit. Bailey disagrees, arguing that Experian's purported compliance with the *White* injunction carries little weight because that injunction is not binding here and was issued nearly fifteen years ago.[5] What's more, Bailey argues, Experian has been put on notice by the filing of many lawsuits against it since the *White* injunction that mere compliance with that injunction is not necessarily reasonable under the FCRA.

Ultimately, the Court concludes—as many federal courts have—that

---

[5] Bailey has not disputed that Experian's post-bankruptcy scrub procedures comply with the *White* injunction. *See generally Pl.'s Statement of Disputed Facts*, Dkt. 55-1; *Def.'s Memo. in Supp.* at 9, Dkt. 50-1 ("There is no dispute that Experian complied with the White injunction in this case."); *see also Hamilton Decl.* ¶¶ 12–13, Dkt. 50-3.

**MEMORANDUM DECISION AND ORDER - 23**

Experian's compliance with the procedures set forth in the *White* injunction forecloses Bailey's claim that Experian willfully violated the FCRA as to its reporting of the Alpine account.[6] Section 1681e(b)'s requirement that CRAs implement "reasonable procedures to assure maximum possible accuracy" in credit reporting is subject to a range of plausible interpretations in the context of post-bankruptcy reporting. Experian relied on a federal court injunction which, although not binding here, purported to definitively establish FCRA-compliant procedures for post-bankruptcy reporting. *White*, 2008 WL 11518799, at *14. Bailey contends that times have changed and reliance on the *White* injunction is no longer enough. But, while that is a fair argument for why Experian may have acted *negligently*, it does not raise a triable issue as to whether Experian *willfully* violated the FCRA when it reported the Alpine account in accordance with *White*-injunction procedures.

Nor is the Court persuaded by Bailey's argument that the number of lawsuits

---

[6] *See, e.g.*, *Beers v. Experian Info. Sols., Inc.*, No. 20-CV-1797 (WMW/JFD), 2022 WL 891620, at *5 (D. Minn. Mar. 25, 2022) ("[Plaintiff] has not identified, and the Court's research has not found, any applicable legal authority suggesting that the procedures Experian used here for reporting Chapter 7 bankruptcies willfully violate the FCRA."); *Peterson v. Experian Info. Sols., Inc.*, No. CV 20-606(DSD/ECW), 2021 WL 3116073, at *4 (D. Minn. July 22, 2021), *aff'd on other grounds*, 44 F.4th 1124 (8th Cir. 2022) ("Experian's reliance on the procedures approved in *White* establishes that Experian's reporting was not willful or reckless."); *Benjamin v. Experian Info. Sols., Inc.*, 561 F. Supp. 3d 1330, 1344 (N.D. Ga. 2021) (similar).

filed against Experian since the *White* injunction have put Experian on notice that
those procedures are not FCRA compliant. That line of reasoning is only valid if
those lawsuits resulted in verdicts in the challengers' favor—that is, where the
court or jury concluded that Experian had indeed violated the FCRA despite
complying with the procedures set forth in the *White* injunction. Bailey has not
pointed to any such cases.

    In sum, no jury could reasonably conclude that Experian willfully violated
the FCRA when it reported the Alpine account in compliance with the procedures
set forth in the *White* injunction. Experian is entitled to summary judgment on this
claim.

    The same is not true as to the Zions account, however, because the *White*
injunction does not address the post-bankruptcy reporting of "stale" accounts.
Accordingly, Experian's compliance with the *White* injunction as to the Alpine
account does not foreclose Bailey's willfulness claim as to the Zions account. As
Bailey explains, Experian's own internal policies acknowledge that a data
furnisher's protracted failure to update an account may indicate unreliability. *Pl.'s*
*Resp.* at 8, Dkt. 55. Aware that it lacked any update about the Zions account since
Bailey's bankruptcy, Experian arguably acted recklessly by continuing to report
the account as undischarged with an account balance.

**MEMORANDUM DECISION AND ORDER - 25**

In sum, Bailey has created a triable issue on her willfulness claim as to Experian's reporting of the Zions account. Experian is not entitled to summary judgment on this claim.

### 4. Experian is not entitled to summary judgment on Bailey's negligence claim.

The FCRA also authorizes consumers to sue CRAs for negligently violating § 1681e(b). "To prove a negligent violation, a plaintiff must show that the defendant acted pursuant to an objectively unreasonable interpretation of the statute." *Marino v. Ocwen Loan Servicing LLC*, 978 F.3d 669, 673 (9th Cir. 2020). Ordinarily, the reasonableness of a CRA's procedures under the FCRA is a question for the jury. *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) ("The reasonableness of the procedures and whether the agency followed them will be jury questions in the overwhelming majority of cases.").

Here again, a key issue is the significance of Experian's compliance with the procedures set forth in the *White* injunction. According to Experian, its compliance with those procedures is enough, alone, to establish that its interpretation of the FCRA was objectively reasonable. *Def.'s Memo. in Supp.* at 2, Dkt. 50-1. Conversely, Bailey argues that compliance with the *White* injunction has little or no probative value as to the objective reasonableness of Experian's current

procedures because, in an ever-evolving industry, what was reasonable in 2008 may not be reasonable now.

Bailey's position finds support in a set of recent, unpublished decisions from the Ninth Circuit. *See Sunseri v. Experian Info. Sols., Inc.*, No. 21-55583, 2022 WL 1315303, at \*1–2 (9th Cir. May 3, 2022); *Hernandez v. Experian Info. Sols., Inc.*, No. 21-55588, 2022 WL 1315306, at \*1–2 (9th Cir. May 3, 2022); *Wheeler v. Experian Info. Sols., Inc.*, No. 21-55585, 2022 WL 1315301, at \*1–2 (9th Cir. May 3, 2022). There, the Ninth Circuit reviewed a district court's dismissal of three FCRA claims. Reversing the lower court, the Ninth Circuit held that the plaintiffs' claims were plausible and not barred by collateral estoppel, despite Experian's purported compliance with the *White* injunction. *Id.* at \*1. "Reasonableness," the court explained, "is not a static issue, and procedures that met the high bar of § 1681e(b) fourteen years ago may not today." *Id.*

Throughout its briefing, Experian repeatedly cites the principle, articulated by the Ninth Circuit in *Marino v. Ocwen Loan Servicing LLC*, that CRAs will "nearly always avoid liability" under the FCRA when the applicable statutory provision is "less than pellucid." 978 F.3d at 673 (quoting *Safeco*, 551 U.S. at 69). But, while that may be true in the broad scheme of things, applying that principle in the way Experian requests here would effectively foreclose all FCRA

enforcement actions against CRAs. By congressional design, the standards imposed on CRA's in the FCRA are imprecise and depend upon "fact-intensive" inquiries into the reasonableness of credit-reporting procedures. *See Hernandez*, 2022 WL 1315306, at *1. That cannot mean, however, that CRAs are effectively immunized from all lawsuits under the FCRA.

Bailey has offered evidence from which a jury could find that Experian's procedures were not objectively reasonable. First, Experian failed to report the Alpine account as discharged because its post-bankruptcy scrub only applied to debts reporting more than 90 days late. TransUnion and Equifax, in contrast, accurately reported the Alpine account as discharged with no balance because their post-bankruptcy scrubs applied to debts reporting only 30 or more days late. *See Ferrin*, 617 F.Supp.3d at 1006–07 ("A jury may also use as evidence the fact that other CRAs handled the situation differently, correctly reporting the status of [the plaintiff's] Firefly and Target accounts."); *see also Benjamin*, 561 F. Supp. 3d at 1341. Second, Experian continued reporting Bailey's Zions account after it was discharged despite not receiving any update from the furnisher for over a year following Bailey's bankruptcy.

Viewing the evidence in the light most favorable to Bailey, the Court concludes that a jury could reasonably find that Experian's post-bankruptcy scrub

procedures were not objectively reasonable. Experian is therefore not entitled to summary judgment on Bailey's negligence claims.

**5.      Experian is not entitled to summary judgment on the issue of causation.**

To succeed on an FCRA claim, a plaintiff must have suffered "actual damages" as a result of the defendant's statutory violation. *Banga v. Experian Info. Sols.*, No. 08-CV-04147-SBA, 2010 WL 11531066, at *2 (N.D. Cal. Mar. 8, 2010), *aff'd*, 473 F. App'x 699 (9th Cir. 2012). Experian argues that Bailey has not raised a triable issue as to the causal connection between her alleged credit harms and Experian's inaccurate reporting of her Alpine and Zions accounts.

Bailey has provided expert and other evidence indicating that Experian's inaccurate reporting likely reduced her credit score and significantly increased her debt-to-income ratio. *See Hendricks Dep.* at 216:18–21, Dkt. 51-3; Hendricks Report at 11–12, Dkt. 55-3. She has provided evidence that Citibank denied her application for a line-of-credit after receiving Experian's inaccurate credit report. Dkt. 50-23. And she has also provided evidence that a lender relying on TransUnion's accurate report offered her substantially more advantageous loan terms than the lender that relied upon Experian's inaccurate report. *Pl.'s Statement of Disputed Facts* at 9–10, Dkt. 55-1.

Viewing this evidence in the light most favorable to Bailey, the Court

concludes that a jury could reasonably find a causal connection between Experian's inaccurate reporting and the adverse lending decisions of Citibank and Santander. Accordingly, Experian is not entitled to summary judgment on the issue of causation.

### 6.    Experian is not entitled to summary judgment on Bailey's claim for emotion distress damages.

Finally, Experian acknowledges that emotional distress damages are recoverable under the FCRA, but argues that Bailey's self-serving affidavit is insufficient, on its own, to raise a triable issue as to such damages.

"Actual damages" under the FCRA may include "humiliation and mental distress, even in the absence of out-of-pocket expenses." *Boyle v. KarmaCheck, Inc.*, No. 22-cv-04724-TSH, 2022 WL 17371152, at *7 (N.D. Cal. Oct. 27, 2022) (citing *Guimond*, 45 F.3d at 1333). To survive summary judgment, a plaintiff claiming emotional distress must submit evidence that "reasonably and sufficiently explains the circumstances of [her] injury and does not resort to mere conclusory statements." *Moran v. Screening Pros, LLC*, No. 212CV05808SVWAGR, 2020 WL 4724307, at *10 (C.D. Cal. July 30, 2020), *aff'd*, 25 F.4th 722 (9th Cir. 2022) (quoting *Taylor v. First Advantage Background Servs. Corp*, 207 F. Supp. 3d 1095, 1105 (N.D. Cal. 2016)). However, there is no per se rule in this circuit requiring something more than a plaintiff's own sworn statement describing her

emotional distress.

Here, Bailey does more than offer "conclusory testimony of emotional distress." *Def.'s Memo. in Supp.* at 18, Dkt. 50-1. Instead, she identifies at least four specific manifestations of emotional distress: increased conflict with her husband, *Bailey Dep.* at 148:2–13, 148:20–149:2, 150:2–15, 151:18–25, constant anxiety, 143:17–144:5, sleep loss, 140:12–142:4, and recurring headaches, 144:13– 145:7. At trial, Experian may dispute the existence or degree of these purported symptoms of emotional distress. But, for now, Bailey has presented sufficient evidence from which a jury could award damages for emotional distress.

Experian is not entitled to summary judgment on Bailey's claim for emotional distress damages.

## ORDER

**IT IS ORDERED that:**

1.      Plaintiff's Motion to Exclude Expert Testimony (Dkt. 51) is **GRANTED in part and DENIED in part**, as set forth in this Order; and

2.      Plaintiff's Motion for Summary Judgment (Dkt. 50) is **GRANTED in part and DENIED in part**, as set forth in this Order.

DATED: September 28, 2023

B. Lynn Winmill
U.S. District Court Judge